## STATE v. MELVIN L. GEBHARD.

137 N. W. (2d) 168.

September 24, 1965—No. 39,558.

*Kempe & Murphy* and *Thomas M. Murphy,* for appellant.

*Robert W. Mattson,* Attorney General, *Linus J. Hammond,* Assistant Attorney General, *Stephen L. Maxwell,* Corporation Counsel, and *Daniel A. Klas,* Assistant Corporation Counsel, for respondent.

MURPHY, JUSTICE.

This is an appeal from a judgment of conviction involving an alleged violation of Minn. St. 169.09, which imposes upon the driver of any vehicle involved in an accident resulting in injury or damage the duty to stop until he has fulfilled the requirements of law relating to the giving of information, and punishes as a misdemeanor failure to comply therewith. The action was tried to the court without a jury. Defendant's principal claim of error is that he was convicted by the use of evidence obtained through an unlawful search and seizure.

The offense with which defendant was charged grew out of an accident which occurred October 18, 1963, at approximately 7 p. m. when a car allegedly driven by defendant struck and killed a pedestrian. At about 10:30 on the morning of October 19, 1963, an officer of the St. Paul Police Department was engaged in making an investigation of two hit-and-run accidents which occurred the previous night. He called at defendant's home and inquired of defendant as to his knowledge of the accidents. It appears that defendant had no objection to the interview and, at the officer's request, backed his car out of the garage so that it might be examined. Defendant accompanied the policeman to police headquarters and was questioned further with reference to his knowledge of the accidents. He consented to having his car towed to the police garage. Later two officers returned to defendant's home and, with permission of defendant's wife, removed certain contents from the trash barrel located on the premises. It does not appear from the record that defendant was forcibly detained at the police station although he left with his attorney at 5 p. m. While he was there, it appears that he answered questions freely. The automobile remained at the police garage until about a week later

although several demands were made for its return. Defendant admitted that he was involved in another accident on the same night but denied that he had driven the car which was involved in the fatal accident.

Prosecution for the misdemeanor was instituted by complaint filed in municipal court. None of the witnesses who testified at the trial actually identified defendant as the driver of the automobile, but several witnesses at the scene of the accident identified his automobile as similar to the one involved in the accident. The glass from the sealed beam headlight taken from defendant's automobile and trash barrel matched pieces taken at the scene of the accident. It is contended that photographs of the automobile and parts and pieces of the automobile used in evidence were illegally obtained by the state through an unlawful search and seizure. Timely motions to suppress the evidence were made and defendant's counsel duly interposed objections to the introduction of the evidence at the trial.

We must rely upon the record to determine whether the prosecuting authorities legally came into possession of the evidence used against defendant. The evidence on this point comes from the testimony of Police Officer Bernard Tacheny, who stated:

"A. * * * he said he thought what I was here for was an accident he had which he should have reported, hit and run, and he also made a statement about another accident that he hoped I wasn't there to blame him or try and connect him with that accident.

"Q. When he said these things to you had you indicated why you had come to his house?

"A. No, I didn't say a word.

"Q. When he talked about an accident he should have reported did you subsequently find out what he was talking about?

"A. Yes.

"Q. What was that accident?

"A. That was an accident that occurred on Victoria.

"Q. 1341 Victoria?

"A. Yes.

"Q. That would also be on the 18th of October?

"A. Yes."

Officer Tacheny asked defendant if he could look at his automobile. Defendant said "yes" and backed his car out of the garage for the officer to view. Officer Tacheny testified:

"Q. Now, could you describe again the headlight—what did you notice about the right front headlight?

"A. It was broken.

\* \* \* \* \*

"Q. Now, did you see any other damage to any other light on that car?

"A. There was a turning signal, turning light lens.

"Q. Could you describe the color of the car?

"A. Well, I describe it as being a bronze or copper colored automobile."

Officer Tacheny further testified:

"Q. While you were still at Mr. Gebhard's house on the 19th, did you have conversation regarding Mr. Gebhard's activities on the previous evening?

"A. Yes, I did.

"Q. What do you recall about that at this time?

"A. Well, he said that he admitted to the accident he had on Victoria and that he was—he couldn't quite give me the exact time. He said he had been drinking quite a bit at his home and that when he did hit the car down there on Victoria he proceeded down to Como where he turned around and came back home. I asked him the time again and he stated that due to his condition he didn't remember any time and he couldn't recall.

"Q. Did he say where he was going when he hit this car on Victoria?

"A. I believe, he said he was going down to a hockey game.

"Q. Did he tell you whether or not anyone was with him?

"A. No, I think he said he was alone."

Another officer gave the following testimony with reference to a further interview at the police department:

"He said he finished up work at the 'Mining' at about 3:30 and drove home and he was doing some refinishing of furniture and he was using

a substance—varnish remover he called 'Peel Off'. At that time I questioned him in regard to the actions of this, and he said he used it in his basement which is well ventilated, using a fan for ventilation. He said that he had used this many times previously and had suffered no ill effects from it. He said he worked at this for approximately an hour and a half before he had his dinner. He said he had 4 whiskey hi-balls and then he had his dinner and after dinner he had 2 whiskey hi-balls, at which time he decided to go to the hockey game. He left his house about 6:45 or 7:00 and he traveled down Victoria in a southerly direction and while going down Victoria he struck a '63 Oldsmobile, white, that he did stop and examined the car that he struck and didn't find any damage to the parked car, but did find very slight damage to his right side of his car. He said he continued on Victoria to Como, or he said, excuse me, while he was at the Victoria accident scene he made the statement that he realized then that he was, 'Under the weather', he put it, and that he decided instead of going to the hockey game he would return home. I asked him about his route after this accident, and he said he continued on Victoria. The first route he gave was Victoria around to Como and down Como Avenue to Dale Street, and then north on Dale Street to Montana, and then around to his home straight out Montana. Then he said that he thought he was wrong about that route, that instead of going down Como to Dale he went to Como Lake and went around east side of the lake back to his home where he stayed that night. I asked him about his car, who was driving, if there was anyone else with him and he said he was alone, and that when he got back home he parked his car in his garage and it stayed there until the following morning when he went out and took the car from the garage, and he told us that he removed the remaining portion of the right outboard headlight and threw them in his incinerator. At that point I asked Mr. Gebhard if we could have permission to have a couple of officers go to his home and go to his incinerator and remove the contents of that incinerator, which he readily agreed to."

Later the same day, with permission of defendant's wife, the police removed pieces of broken headlight glass from the trash barrel located at defendant's house.

The trial court duly considered defense counsel's objections to the introduction of the evidence and came to the conclusion on the basis of the record that defendant had consented to the search and accordingly denied defendant's motion. The trial court said:

"Well, it is part of the record and the Court takes judicial notice of all prior proceedings in any matter. Well, I have examined the briefs submitted herein by the State and by the Defendant and both briefs cite controlling law on the subject of the case of State versus Harris, 121 N. W. 2nd [327], which the Court has before it. The Court does not quarrel with the contention of the Defendant that the law is that an arrest takes place when a person's liberty is restricted by an officer of the law. Nor, does the Court quarrel with the contention that the general statement of the law that where there is an unlawful search and seizure that is without warrant of arrest in a misdemeanor and without consent, that such evidence must be suppressed. The problem which the Court has here is that in both instances, both as to whether or not there is an arrest and whether or not there is an illegal search and seizure turn on whether or not there is consent of the Defendant. In this case the officer, Bernard Tacheny, has testified that he asked the Defendant if he could look at the car and that the Defendant said he could look at it. The Defendant then backed the car out of the garage and they had conversation regarding the automobile, conversation about another hit and run accident not connected with this case directly. And that the Defendant then agreed to go to the station voluntarily upon request of the officer. I have seen no evidence in this case which would indicate against the consent of this Defendant, that the police officer restricted his liberty of movement. It is true he has—and I assume that he had his uniform on being in the performance of duty. But, the mere fact of the presence of a police officer in uniform does not constitute such a situation as to raise a presumption or create any sort of coercion. And if such a presumption could be made, as is argued by Counsel, I think it is rebutted by the fact—by the direct testimony of Officer Tacheny that the Defendant consented both to come to the station and he also consented to have his car being towed in, and to the examination of the automobile by the officer then present. I am going to deny that motion to suppress evidence."

■ In State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N. W. (2d) 628, we held that evidence obtained as a result of a search of defendant's automobile without a warrant was admissible where defendant consented to the search. We have also held that where a defendant permitted police officers to enter his home and look around without a search warrant and incriminating evidence as to the violation of a city ordinance was found, such evidence was admissible. City of St. Paul v. Stovall, 225 Minn. 309, 30 N. W. (2d) 638. In State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, we held that a defendant who did not deny that he consented to a search and did not claim duress or coercion had the burden of proving lack of consent to a search by the police officers.

■ In the final analysis the validity of a search and seizure turns upon the issue of reasonableness. That issue is one of fact and depends upon the particular circumstances in each case. State v. Kinderman, 271 Minn. 405, 136 N. W. (2d) 577; Roberts v. United States (8 Cir.) 332 F. (2d) 892. It is recognized, however, that even where a search is made with the consent of the defendant any claim of waiver of constitutional rights must be viewed with caution. State ex rel. Branchaud v. Hedman, *supra.*

Under the circumstances of this case we think that the trial court properly concluded that the prosecuting authorities came by the evidence in question through the consent of defendant, freely given. The only testimony we have concerning the circumstances of the state's acquiring the evidence is that of the investigating officer. We find nothing in the record which indicates that there were any threats or coercion used to induce the consent, nor do we find that defendant was misled by any assurances given to him or that the investigating officer used any improper methods in securing the evidence. The situation is somewhat the same as that discussed in State v. Harris, *supra,* where we said (265 Minn. 269, 121 N. W. [2d] 334):

"Further, we find no evidence that defendant objected to the search. Failure to object to a search is evidence of consent, Castaneda v. Superior Court (Cal. App.) 26 Cal. Rptr. 364; and consent itself constitutes a waiver of defendant's right to object later that the search was unreason-

able. City of St. Paul v. Stovall, 225 Minn. 309, 312, 30 N. W. (2d) 638, 641; cf. Honig v. United States (8 Cir.) 208 F. (2d) 916."

■ We agree with the trial court that the evidence supports the verdict of guilty. While there were no eyewitnesses who could identify defendant as the driver of the car, there was nevertheless strong circumstantial evidence of guilt. Defendant admitted that he drove the car at or near the scene of the accident on the previous evening; a car answering the description of defendant's automobile was identified by witnesses at the scene of the accident; and laboratory technicians connected defendant's car to the accident by matching broken pieces of the headlight found at the scene of the accident with those taken from the headlight of defendant's automobile. It seems to us that these facts, taken in connection with defendant's admissions of his conduct of the previous evening, amply support the verdict of guilty.

Affirmed.